(No. 82-CC-0793-

ALONZO JONES, Claimant, *v.* THE STATE OF ILLINOIS, Respondent.

*Opinion filed August 28, 1997.*

JAMES P. CHAPMAN, Counsel for Claimant.

JAMES E. RYAN, Attorney General (ANDREW N. LEVINE, Assistant Attorney General, of counsel), for Respondent.

## OPINION

SOMMER, C.J.

This matter comes to be heard on the claim of Alonzo Jones ("Jones") for personal injuries sustained in an incident that occurred while he was an inmate of Stateville Correctional Center on or about January 19, 1981. Specifically, Jones asserts that the State's failure to adequately maintain an area of the prison wherein Jones was

required, as a prisoner employee (plumber), to perform his work assignments, resulted in serious and permanent injuries to his person.

The transcript of the proceedings and the evidence stipulated to therein reveals the following facts concerning the incident whereby Jones claims his injuries occurred and the nature and extent of the injuries themselves. For some time before January 19, 1981, while incarcerated at Stateville, Jones was employed as a plumber and was under the supervision of a civilian employee of the State. Jones testified that the job of a plumber is considered a well-paying and sought-after position amongst the inmates of Stateville. As a plumber, Jones would be given specific work orders to be completed with his civilian supervisor, ranging from repairing leaks, to shutting off water sources, to unclogging pipes. In general, most of these work orders related to jobs that took place in a "plumbing chase" area that was situated behind individual cells. The plumbing chase mirrored the cellblocks, meaning that each individual cell had an area of the plumbing chase behind it where all the plumbing pipes that entered the cell were located. Five floors of cells in two galleries (east and west) within the rectangular-shaped cellblock meant five floors of plumbing chase that serviced the individual cells of both the east and west galleries of the cell house. However, instead of concrete or metal floors, testimony of the Claimant and other witnesses established that metal scaffolding with wooden planks as flooring comprised the floors of the plumbing chase. These wooden planks or boards were approximately 12 inches wide by 1½ or 2 inches thick. Two 12-inch planks made up the causeway where Claimant Jones and other plumbing workers were expected to walk in endeavoring to complete their work orders in the plumbing chase.

Claimant Jones testified that, as a routine, he and his supervisor started with the work orders at the top of the chase and worked their way downward using the ladders inside the chase to complete the assigned work. The Claimant testified that, due to the aged condition of the cellblock and its plumbing, he was assigned to complete work in or about the plumbing chase nearly every day since he had started doing plumbing work, or almost every day from 1977 through the date of the alleged accident in 1981.

On January 19, 1981, Claimant Jones was working with his supervisor at the time, Mr. Rocky Guggliemucci, doing routine maintenance in the plumbing chase. On that date, Jones and Mr. Guggliemucci were breaking for lunch and were walking in a northerly direction to exit the plumbing chase along the boards. The Claimant stated that he was carrying a tool box weighing approximately 50 pounds and measuring 3 feet long. Walking single-file with Jones preceding Mr. Guggliemucci by four to five feet, Jones testified that it was not necessary to use a flashlight to see the board where it was necessary to walk.

As he was walking along inside the plumbing chase and upon the aforementioned boards, the board under his left foot broke "all the way through" forcing him to grab a pipe with his left hand to prevent his falling to the bottom of the plumbing chase.

The Claimant stated that he felt a snap in his back as he fell and his body bent awkwardly. In addition, he stated that, although he did not think he was hurt that badly, he could not move his left arm, which had been hurt (dislocated) when he was forced to grab the pipe to stop his fall. The Claimant told his superintendent, "Venegone," of the incident and his injury; and, thereafter, went to the prison hospital. The Claimant did not return to work that afternoon.

For a period of six or seven days, Claimant Jones confined himself to his bed in his cell until he was taken to the prison hospital, where he stayed for approximately seven months. The Claimant testified that he received very little treatment while in the prison hospital, although he claimed to be in excruciating pain. In July of 1981, the Claimant had a laminectomy performed on his lower back at the University of Illinois Hospital. The surgery necessitated a three-week hospitalization. Thereafter, the Claimant was not able to resume his duties as a plumber due to pain, residual numbness and weakness in his back and left leg; and after four months, he was transferred to a light maintenance job. From that point to the date of the hearing, the Claimant held numerous jobs related to light maintenance and refrigeration at Stateville Correctional Center, and then at Danville Correctional Center, and then at Dixon Correctional Center.

The Claimant also asserts that the residual injuries from his accident included his legs "giving out" at certain moments, a progressively worsening loss of sensation in his legs and feet leading to a loss of balance, and an incontinence problem. He attributes all or most of his current, serious physical problems to the accident.

However, prior to this incident, the Claimant had injuries to his back in 1978, necessitating a partial laminectomy, and in 1979, resulting in a short hospitalization. Even with the prior back problems, the Claimant asserts that, despite constant pain and very heavy work, he was able to fulfill his work duties. Medical records of Jones from 1978 and 1979 indicate complaints of numbness in the left foot and leg, and complaints of low back pain.

The Claimant called the following persons to testify at the hearing: Mr. John McSweeney, who was Stateville's electrical foreman during the relevant period; Mr. Robert

Hodges, a fellow inmate and plumbing worker; Mr. John Corneglio, Jr., a fellow inmate; and, Mr. Philip Manzella, a fellow inmate and plumbing worker.

In brief summary, these witnesses proffered consistent testimony that the planks or boards in the plumbing chase were old, cracked, waterlogged due to various leaks in the area, and generally in poor condition. Furthermore, in testimony that covered the period from 1974 to the period soon after the accident, the above-mentioned witnesses stated that various oral complaints were lodged or discussed with various prison personnel regarding the poor and/or dangerous condition of the plumbing chase's planks. No written grievances appear to have been filed, or at least produced, to support these complaints. Of particular note was testimony that certain civilian employees of the prison would not venture into the plumbing chase due to the condition of the planking and that certain heavier employees would not stand next to each other as they worked.

The Claimant stated that he had complained of the nature and condition of the planks, but did not file a written grievance, as was his right, for fear of losing his advantageous job.

The case law provides that the State of Illinois has a duty to provide a reasonably safe place for inmate employees to perform their required work duties. (*Hammer v. State* (1987), 40 Ill. Ct. Cl. 173; *McGee v. State* (1977), 31 Ill. Ct. Cl. 326.) It is clear from the weight of the testimony offered by the Claimant and his witnesses that the State failed to fulfill that duty with regard to the Claimant. The plumbing chase, particularly the wooden planking upon which workers, by necessity, walked upon to accomplish their work order, was in an unsafe condition; and furthermore, the State, by its agents and employees

knew or should have known of that unsafe condition, but failed to correct the condition. Based upon this finding, the State is liable to Claimant Jones for the injuries he suffered in the accident of January 19, 1981.

However, the precise nature and extent of those injuries sustained by the Claimant are in dispute. It is the duty of the Claimant to prove by a preponderance of the medical evidence that the nature and extent of the injuries for which he claims he deserves compensation, were proximately caused by the State's negligence, as described in the preceding paragraph. Jones claims he suffers from serious and permanent injuries, but he fails to offer evidence that demonstrates, to a reasonable degree of medical certainty, that those injuries were caused by his fall in the plumbing chase in January of 1981. Most serious results of the injuries claimed by Jones are the laminectomy surgical procedure which occurred in July 1981, the failure to be able to return to his normal, pre-accident routine and subsequent associated numbness, weakness and incontinence. The Claimant failed to offer any substantive medical testimony that refuted the Respondent's assertion that the laminectomy was necessitated by a degenerative condition called stenosis and that the January 1981 fall had little or no impact upon the decision to perform the surgery.

Rather, the Claimant asks that the Court infer the injuries by circumstance; *i.e.,* that Jones was fulfilling his obligations as a plumber prior to the accident but could not do so afterward; and, thereafter, also had a surgery. The Claimant asserts that this "proves" that the serious physical problems now afflicting Jones are directly attributable to his January 1981 fall.

The Claimant fails to address the fact that Jones had serious back problems prior to January 1981, and in addition,

admitted that he experienced great pain while working prior to his accident. Medical records also show Jones complained of numbness in his leg and back pain on two occasions prior to 1981. An orthopedic surgeon, Dr. Xamnan Tulyasathien, testified that the laminectomy performed upon Jones in July of 1981 was performed to relieve stenosis, a narrowing of the spinal canal, which was impinging on various nerves, and opined that said stenotic condition was not due to trauma. Neither physician that testified could state that the Claimant's condition, specifically the stenosis of his spine, was "caused" by trauma in general, much less the specific trauma claimed by Jones to have caused the condition which necessitated his undergoing a laminectomy.

Thus, it is speculation as to whether the fall in January 1981 may or may not have caused or contributed to Jones' July 1981, laminectomy and his subsequent physical problems. The Claimant has not sustained his burden of proof with regard to the cause of his injuries and as to the nature and extent of those injuries. The Claimant cannot be compensated for his injuries based upon speculation.

In addition, it is noteworthy that Claimant Jones received very little treatment other than aspirin for the six or seven month duration he was in the prison hospital after his fall and prior to his surgery. This fact supports the Respondent's argument that the back surgery was necessitated by a degenerative condition and undermines the Claimant's position that said surgery was due to a traumatic injury sustained in his fall of January 19, 1981.

It is clear that Claimant Jones sustained some nonspecific injuries to his left arm, left shoulder, left wrist and lower back as a result of his fall due to the unsafe condition of the plumbing chase. He suffered some pain

as a result of these injuries. The Claimant admits that the left arm and left shoulder injuries resolved soon after the accident, but that he had a scar on his left wrist. The Claimant asserts that the lower back injury was serious enough to necessitate a laminectomy surgery in July of 1981, but fails to back up said assertion with competent medical testimony. As such, without medical evidence in support, no compensation can be awarded to the extent requested by the Claimant.

For the reasons stated, we award the Claimant $4,800.